# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| JAMES VAN VELKENBURG, individually and on behalf of all others similarly situated, )<br><br>Plaintiff, )<br><br>v. )<br><br>JOSEPH KWOK, JONATHAN G. ATKESON, DONALD P. HAMM, MARTIN TUCHMAN, DOUGLAS A. HACKER, JOSEPH P. ADAMS, JR., PAUL R. GOODWIN and SEACUBE CONTAINER LEASING LTD., )<br><br>Defendants. ) | **Case No.**<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff James Van Velkenberg ("Plaintiff"), by his attorneys, alleges upon information and belief, except for his own acts, which are alleged on knowledge, as follows:

1.      Plaintiff brings this class action on behalf of the public stockholders of SeaCube Container Leasing Ltd. ("SeaCube" or the "Company") against SeaCube's Board of Directors (the "Board" or the "Individual Defendants") for their violations of Bermuda law and Section 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 14a-9 promulgated thereunder ("Rule 14a-9") arising from their attempt to sell the Company to affiliates of Ontario Teachers' Pension Plan ("OTPP").

2.      SeaCube is one of the world's largest container leasing companies based on total assets. The principal activities of SeaCube's business include the acquisition, leasing, re-leasing and subsequent sale of refrigerated and dry containers and generator sets. SeaCube leases containers primarily under long-term contracts to a diverse group of the world's leading shipping lines.

3. On January 18, 2013, OTPP and the Company announced a definitive agreement under which OTPP, through its affiliates 2357575 Ontario Limited ("Ontario Limited") and Ontario Limited's subsidiary SC Acquisitionco Ltd.("Merger Sub"), will acquire all of the outstanding shares of SeaCube for $23.00 per share in cash (the "Proposed Transaction"). The Proposed Transaction is valued at approximately $466.9 million. As described in more detail below, given SeaCube's recent strong performance as well as its future growth prospects, the consideration shareholders will receive is inadequate and undervalues the Company.

4. Additionally, the Proposed Transaction is the result of a conflict-laden sales process through which controlling shareholder Fortress Investment Group LLC ("Fortress") sought to achieve liquidation of its sizable debt and equity holdings in the Company. Through its 42% interest in the Company, Fortress successfully installed Joseph Kwok ("Kwok") as the Company's Chief Executive Officer ("CEO"), and has selected six of the seven directors on the Board.

5. Fulfilling Fortresses' mandate, the Board allowed Kwok to run the sales process unfettered—an opportunity Kwok and his management team took to favor OTPP, a potential purchaser that offered to retain SeaCube management's services after closing of the Proposed Transaction.

6. On January 30, 2013, SeaCube filed a Preliminary 14A Proxy Statement (the "Proxy") with the United States Securities and Exchange Commission ("SEC") in connection with the Proposed Transaction. The Proxy fails to provide the Company's shareholders with material information regarding the sales process undertaken by the Company as well as the financial analyses performed by Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill Lynch"), and Deutsche Bank Securities Inc. ("Deutsche Bank"), the Company's financial

advisors, and/or provides them with materially misleading information thereby rendering the shareholders unable to make an informed decision on how to vote at the special stockholder meeting.

7.     Defendants have exacerbated their breaches of fiduciary duty by agreeing to lock up the Proposed Transaction with deal protection devices that unreasonably restrain other bidders from making a successful competing offer for the Company. Specifically, pursuant to the Merger Agreement, defendants agreed to: (i) a strict no-solicitation provision that prevents the Company from soliciting other potential acquirers or even in continuing discussions and negotiations with potential acquirers; (ii) a provision that provides OTPP with 4 business days to match any competing proposal in the event one is made; and (iii) a provision that requires the Company to pay OTPP a termination fee of $15.5 million in order to enter into a transaction with a superior bidder. These provisions substantially and improperly limit the Board's ability to act with respect to investigating and pursuing superior proposals and alternatives, including a sale of all or part of SeaCube.

8.     Defendants have violated Section 14(a) and 20(a) of the Exchange Act and Rule 14a-9 promulgated thereunder, by omitting material facts necessary to render the Proxy non-misleading. Plaintiff seeks to enjoin the Proposed Transaction unless and/or until defendants cure these omissions.

## JURISDICTION AND VENUE

9.     This Court has subject matter jurisdiction under 28 U.S.C. § 1331 (federal question jurisdiction), as this Complaint alleges violations of Section 14(a) and 20(a) of the Exchange Act and Rule 14a-9.

10.     This action is not a collusive one to confer jurisdiction on a court of the United States, which it would otherwise not have.

11. Venue is proper in this district because Defendant SeaCube maintains its principal executive offices in the district and the defendants have conducted business and engaged in numerous activities, which have had an effect on this district.

## PARTIES

12. Plaintiff is, and has been at all relevant times, the owner of shares of common stock of SeaCube.

13. SeaCube is a corporation organized and existing under the laws of Bermuda. It maintains its principal executive offices at One Maynard Drive Park Ridge, New Jersey 07656. SeaCube is named as a defendant solely for the purpose of providing full and complete relief.

14. Defendant Kwok has been the Chief Executive Officer of the Company since March 2010, and a director of the Company since March 2011. Kwok is also the Chairman and former CEO of Seacastle Inc. ("Seacastle"), which is controlled in part by Fortress.

15. Defendant Jonathan G. Atkeson ("Atkeson") has been a director of the Company since March 2010. Atkeson has also been a Managing Director of Fortress Capital Finance, an affiliate of Fortress since October 2010.

16. Defendant Donald P. Hamm ("Hamm") has been a director of the Company since October 2010. Hamm was placed on the Board by Fortress.

17. Defendant Martin Tuchman ("Tuchman") has been a director of the Company since March 2011.

18. Defendant Douglas A. Hacker ("Hacker") has been a director of the Company since October 2010. Hacker was placed on the Board by Fortress.

19.     Defendant Joseph P. Adams, Jr. ("Adams") has been a director of the Company since March 2010 and currently serves as Chairman of the Board. Adams has also been a director of Seacastle since October 2010, as well as a Managing Director of Fortress since April 2004.

20.     Defendant Paul R. Goodwin ("Goodwin") has been a director of the Company since October 2010. Goodwin was placed on the Board by Fortress.

21.     Defendants referenced in ¶¶ 14 through 20 are collectively referred to as Individual Defendants and/or the Board.

## CLASS ACTION ALLEGATIONS

22.     Plaintiff brings this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3) on behalf of all persons and/or entities that own SeaCube common stock (the "Class"). Excluded from the Class are Defendants and their affiliates, immediate families, legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

23.     The Class is so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through discovery, Plaintiff believes that there are thousands of members in the Class. According to the Agreement and Plan of Amalgamation between the Company and OTPP dated January 18, 2013, as of that date 2012, 20.3 million shares of common stock were represented by the Company as outstanding. All members of the Class may be identified from records maintained by SeaCube or its transfer agent and may be notified of the pendency of this action by mail, using forms of notice similar to that customarily used in securities class actions.

24.     Questions of law and fact are common to the Class, including, *inter alia*, the following:

> (i)     Whether the Individual Defendants misrepresented and omitted material facts in contravention of Section 14(a) and 20(a) of the Exchange Act and Rule 14a-9 promulgated thereunder;
>
> (ii)     Whether plaintiff and the other members of the Class would be irreparably harmed were the transactions complained of herein consummated;
>
> (iii)     Is the Class entitled to injunctive relief or damages as a result of defendants' wrongful conduct.

25.    Plaintiff's claims are typical of the claims of the other members of the Class. Plaintiff and the other members of the Class have sustained damages as a result of Defendants' wrongful conduct as alleged herein.

26.    Plaintiff will fairly and adequately protect the interests of the Class, and has no interests contrary to or in conflict with those of the Class that Plaintiff seeks to represent.

27.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy. Plaintiff knows of no difficulty to be encountered in the management of this action that would preclude its maintenance as a class action.

## FURTHER SUBSTANTIVE ALLEGATIONS

### *Company Background and Growth*

28.    SeaCube was incorporated in 2010 by Seacastle Operating Company Ltd, a subsidiary of Seacastle Inc., which is owned by private equity funds managed in part by an affiliate of Fortress. Fortress currently owns approximately 42% of the equity interest in the Company and has utilized this controlling power to install Kwok as CEO, along with six of the seven current directors on the Board.

29.     SeaCube has quickly become one of the world's largest container leasing companies based on total assets. The principal activities of SeaCube's business include the acquisition, leasing, re-leasing and subsequent sale of refrigerated and dry containers and generator sets. The company's containers are used to ship products internationally and facilitate movement of goods via multiple transportation modes, including ships, rail, and trucks. SeaCube leases containers primarily under long-term contracts to a diverse group of the world's leading shipping lines.

30.     The Company's success can readily be seen through its recent growth. In fact, in six of the Company's last eight quarters, SeaCube's financial results have beat analyst estimates.

31.     Much of the Company's success has come in the past year. On May 7, 2012 the Company reported its first quarter 2012 financial results, indicating impressive increases in income and revenue. Highlights include:

- For the first quarter, adjusted net income increased 34% year-over-year to $12.5 million, or $0.62 per diluted common share. First quarter net income increased 12% year-over-year to $11.3 million.
- Declared a dividend of $0.28 per share, an increase of 7.7% from the prior quarter.
- Total revenue increased 33% year-over-year to $49.0 million for the first quarter.

32.     These increases continued into the Company's second 2012 fiscal quarter, as evidenced by a press release announcing the Company's second quarter results on August 6, 2012:

- For the second quarter, adjusted net income increased 28% year-over-year to $13.3 million, or $0.66 per diluted common share. Second quarter net income increased 43% year-over-year to $11.8 million.
- Declared a dividend of $0.29 per share, an increase of 3.6% from the prior quarter.
- Total revenue increased 21% year-over-year to $49.4 million for the second quarter.

7

33.    Most recently, on November 5, 2012, the Company reported its third quarter 2012 financial results. In line with the first two quarters of the year, SeaCube's third quarter displayed significant growth across the same key financial metrics:

•    For the third quarter, adjusted net income increased 15% year-over-year to $12.8 million, or $0.63 per diluted common share. Third quarter net income increased 30% year-over-year to $11.4 million.
•    Declared a dividend of $0.30 per share, an increase of 3.4% from the prior quarter.
•    Total revenue increased 9% year-over-year to $49.5 million for the third quarter.

34.    As seen from these financial results, the Company's success has manifested itself in continually increasing returns for shareholders. Although the Company has only been incorporated since 2010, it has raised the quarterly dividend amount six times.

35.    Speaking of the Company's steady growth, stable cash flows, and increasing returns for shareholders, Kwok stated:

During the third quarter, SeaCube once again generated strong revenue, earnings, and cash flow. We also continued to grow our container fleet in manner that meets our investment criteria. Year to date, we have committed to purchase approximately $318.8 million in containers, of which 85% are already committed to long-term lease. We expect our investments in 2012 to continue to positively impact results. . . The Board's decision to increase the dividend for the seventh time since going public highlights SeaCubes strong and stable cash flows. SeaCube has now increased its dividend 50% since the IPO in October 2010 for a cumulative payout of $2.25 per share. With significant capital available to invest, we will continue to pursue attractive opportunities to further grow revenues, earnings and cash flow in an effort to provide good returns for SeaCube shareholders.

**The Proposed Transaction is Unfair**

36.    In a press release dated January 18, 2013, the Company announced that it had entered into a merger agreement with OTPP pursuant to which OTPP, through its affiliates Ontario Limited and Ontario Limited's subsidiary Merger Sub will acquire all of the outstanding

shares of SeaCube for $23.00 per share in cash. The Proposed Transaction is valued at approximately $466.9 million.

37. Despite the Company's steady growth, the Proposed Transaction provides a premium of just 13.3% based on the closing price of the Company's stock on January 18, 2012.

38. Also, as part of the Proposed Transaction the Company has agreed not to pay dividends to shareholders for the Company fourth quarter of 2012 or first quarter of 2013. The Defendants agreed to this despite the fact that the Company is expected to continue its pattern of strong financial results for these quarters—announcements which have typically brought shareholders lucrative quarterly dividends that they will now be denied.

39. Further, analysts at Deutsche Bank, one of the Company's financial advisors, announced a price target of $24 per share for the Company's stock on November 7, 2012.

40. Additionally, the analyses of both of the Company's financial advisors in connection with the Proposed Transaction, Merrill Lynch and Deutsche Bank indicate that the consideration offered in the Proposed Transaction undervalues the Company. Merrill Lynch's *Selected Publically Traded Companies Analysis* and *Discounted Cash Flow Analysis* resulted in implied per share value equity reference ranges for the Company's stock with high ends of $27.75 and $24.75, respectively. Likewise, each of Deutsche Bank's analyses resulted in implied per share value equity reference ranges with high ends above the price of the Proposed Transaction consideration. The *Selected Companies Analysis* produced high values of $25.50, $28.25, and $27.50 per share; the *Selected Precedent Transactions Analysis* produced a high of $28.50 per share, and; the *Discounted Cash Flow Analysis* produced a high value of $24.50 per share.

41. As such, the Proposed Transaction consideration fails to reflect the Company's steadily strong performance, and continued growth, instead reflecting the efforts of Fortress to quickly liquidate its significant debt and equity holdings in the Company.

***The Conflict-Laden Sales Process***

42. Due to the size of Fortress' equity holdings, Fortress could not feasibly liquidate its stake in the secondary market. Therefore, through its selected CEO Kwok, Fortress began pressuring the Board to explore a sale of the Company. Kwok began mounting pressure on the Board in the early part of 2012, with the Board finally agreeing to explore a sales process in September of that year.

43. Unsurprisingly, as six of the seven members of the Board have direct relationships with Fortress, and were appointed to the Board by Fortress, the Board allowed Kwok and his management team to run the sales process. Company management selected the potential buyers, and engaged in discussions with the solicited parties.

44. Kwok and management quickly favored OTPP, as OTPP wasted no time in making it clear that they wished to retain the Company's management after the consummation of a transaction. Although several parties expressed an interest in acquiring the Company, only OTPP and another potential financial buyer were invited to management presentations in November 2012.

45. The Board did not attempt to oversee negotiations, even after management's conflict of interest had become clear—Kwok and his management team still ran negotiations and no Special Committee of the Board was formed to manage these negotiations.

46. Despite the sales process still being formally open, and potential strategic acquirer Party A having submitted a bid with a range equal to OTPPs ($22-23 per share), it quickly

became obvious that OTPP was the favored bidder. On December 12, 2012, the Company and OTPP began exchanging drafts of the Merger Agreement; on December 17, 2012, Kwok and his management team began meeting with representatives from OTPP to discuss the terms of their continued employment and roll-over investment in the post-transaction Company; on December 24, 2012, Kwok even began exchanging drafts of his employment agreement with OTPP.

47.     As the Proposed Transaction began to solidify, the Defendants began to make it clear to the other bidders still in the process that their interest in continuing negotiations was low. When Bidder B requested additional time to submit a bid, the Board refused, essentially forcing Bidder B out of the sales process.

48.     On January 18, 2013, the Board signed the Merger Agreement as Kwok and certain members of management signed their employment agreements with OTPP, simultaneously serving the interests of both Fortress and Kwok while eschewing the interests of the Company's public shareholders.

***The Company's Officers and Directors Are Conflicted***

49.     While shareholders are being cashed out of the Company, SeaCube's management will retain their positions after closing of the Proposed Transaction. Kwok as well as the Company's Chief Operating Officer Stephen Bishop ("Bishop") and General Counsel Lisa Leach ("Leach") have each signed employment agreements with OTPP.

50.     Under his employment agreement with OTPP, Kwok will receive a base salary of $425,000. This figure represents a substantial 21.4% increase over his 2011 salary with the Company. the employment agreement also provides that Kwok will be eligible to receive an annual bonus of up to $743,750—approximately 65% more than his 2011 bonus with the Company. As stated above, the employment agreement also enables Kwok to rollover his equity

interest in SeaCube and make an equity investment of $2.25 million in the post-transaction company. Furthermore, Kwok will be granted options to purchase shares of stock of the post-transaction Company covering 33.75% of the newly established option pool. Such striking benefits undoubtedly create a conflict of interest for Kwok, particularly as he was still, at least nominally, running the sales process as he was negotiating with OTPP for these benefits.

51.     Additionally, pursuant to his employment agreement, Bishop will receive an annual salary of $315,000, with an annual bonus set as anywhere from 50% to 75% of his base salary. It is currently anticipated that Bishop will be terminated without cause six months after closing of the Proposed Transaction. At this point Bishop will be entitled to the various benefits provided under the Company's Key Employee Severance Plan adopted on January 18, 2013.

52.     Furthermore, pursuant to her employment agreement, Leach will receive an annual base salary of $228,000, with an annual bonus set anywhere from 50% to 75% of her base salary. Leach will also receive 100,000 transaction bonus, provided she remains employed with the Company through closing. Also, Leach will make a $500,000 equity investment in the post-transaction company, and will receive options to purchase shares of common stock covering 7.5% of the option pool to be established in the post-transaction company.

53.     Additionally, the Company's non employee directors also stand to receive certain unique benefits through the Proposed Transaction. Upon closing of the Proposed Transaction all restricted shares held by these directors will automatically vest. The chart below details the consideration these directors will receive as a result of this vesting:

| Name | Number of Restricted Shares | Total Transaction Consideration in Respect of Restricted Shares |
| --- | --- | --- |
| Paul R. Goodwin | 10,000 | 230,000 |
| Douglas A. Hacker | 10,000 | 230,000 |
| Donald P. Hamm | 10,000 | 230,000 |

12

| Martin Tuchman | 13,698 | 315,054 |

54.     Therefore, rather than seek a transaction that reflected the Company's true intrinsic value, the management and the Board opted to eschew the interests of shareholders and focus solely on entering into the unfair Proposed Transaction with OTPP.

***The Unreasonably Restrictive Deal Protection Devices***

55.     The Proposed Transaction is also unfair because as part of the Merger Agreement, Defendants agreed to certain onerous and oppressive deal protection devices that operate conjunctively to make the Proposed Transaction a *fait accompli* and ensure that no competing offers will emerge for the Company.

56.     The Merger Agreement contains a strict "no shop" provision that prohibits the Board from taking any meaningful action to ensure that they are in compliance with their fiduciary duties, including solicitation of alternative acquisition proposals or business combinations.

57.     Specifically, § 5.4 of the Merger Agreement includes a "no solicitation" provision barring the Company from soliciting interest from other potential acquirers in order to procure a price in excess of the amount offered by OTPP. Section 5.4 also demands that the Company terminate any and all prior or on-going discussions with other potential acquirers.

58.     The Merger Agreement also contains a "matching rights" provision, whereby the Company must promptly notify OTPP should it receive an unsolicited competing acquisition proposal. Pursuant to § 5.4(d) of the Merger Agreement, the Company must notify OTPP of the bidder's identity and the terms of the bidder's offer. Thereafter, if the Board determines that the competing acquisition proposal constitutes a "Superior Proposal," § 5.4(d) requires the Board to grant Parent 4 business days to amend the terms of the Merger Agreement to make a counter-

offer that the Company must consider in determining whether the competing bid still constitutes a "Superior Proposal."

59.     The effect of these provisions is to prevent the Board from entering discussions or negotiations with other potential purchasers unless the Board can first determine that the competing acquisition proposal is, in fact, "superior," and even then, the Company must give OTPP 4 business days to match the competing acquisition proposal. This severely limits the opportunity for a potential purchaser to emerge, and severely limits the ability of the Board from properly exercising their fiduciary duties.

60.     The Merger Agreement also provides that a termination fee of $15.5 million must be paid to OTPP by SeaCube if the Company decides to pursue the competing offer. The substantial termination fee will ensure that no competing offer will appear, as any competing bidder would essentially be forced to pay a large premium even after absorbing the costs of making a superior offer.

61.     Moreover, in connection with the Proposed Transaction, Seacastle, an affiliate of Fortress entered into voting agreements where 42% of SeaCube's common stock is already "locked up" in favor of the Proposed Transaction with OTPP. Additionally, the Individual Defendants also entered into voting agreements, locking up another 3.9% of the Company's stock in favor of the Proposed Transaction. As such, only an additional 5% of the Company's shareholders need vote in favor of the Proposed Transaction at the special shareholder meeting for the Proposed Transaction to gain the necessary approval.

62.     Ultimately, these preclusive deal protection provisions illegally restrain the Company's ability to solicit or engage in negotiations with any third party regarding a proposal to acquire all or a significant interest in the Company. The circumstances under which the Board

14

may respond to an unsolicited written bona fide proposal for an alternative acquisition that constitutes or would reasonably be expected to constitute a superior proposal are too narrowly circumscribed to provide an effective "fiduciary out" under the circumstances.

***The Materially False and Misleading Proxy***

63.    On January 30, 2013, SeaCube filed the Proxy with the SEC in connection with the Proposed Transaction. The Proxy fails to provide the Company's shareholders with material information and/or provides them with materially misleading information thereby rendering the shareholders unable to make an informed decision on how to vote their shares at the special shareholder meeting.

64.    The Proxy fails to disclose management's projected cash flows (levered or unlevered), changes in net working capital, capital expenditures, and other line items utilized to calculate levered or unlevered free cash flow. While the Proxy states that after September 21, 2012 four potential buyers, including OTTP, were provided cash flow projections, the Proxy fails to disclose these projections.

65.    Information regarding the Company's financial forecasts are material to SeaCube's shareholders as the merger's consummation will deny shareholders the opportunity to share in the Company's future growth. As such, shareholders need be informed of the Company's projected cash flows and other metrics of growth in order to make an informed decision at the special shareholders meeting. This is a particularly material omission as the Proxy states that both Merrill Lynch and Deutsche Bank utilized management's projections in performing discounted cash flow analyses. The absence of such information renders both these discounted cash flow analyses materially misleading.

66.     The Proxy fails to disclose various material elements of Merrill Lynch's financial analyses. These elements include:

(a)     With regards to the *Selected Publically Traded Companies Analysis*: the criteria used to select the publically traded companies utilized in the analysis; the multiples observed for each of the publically traded companies utilized in the analysis, whether Merrill Lynch adjusted the three comparable companies' 2013 EPS for non-cash interest as they adjusted the Company's, and; the reason for which Merrill Lynch calculated TAL International Group, Inc.'s multiple on a pre-tax basis and calculated the other comparable companies' multiples on an after-tax basis;

(b)     With regards to the *Selected Precedent Transactions Analysis*: the criteria used to select the precedent transactions utilized in the analysis; the consideration paid in each precedent transaction utilized in the analysis; the total assets and market capitalization of each company party to the precedent transactions utilized in the analysis; the multiples observed for each of the precedent transactions utilized in the analysis; the reason for which Merrill Lynch selected six transactions, out of only eight utilized in the analysis, whose multiples could not be determined, and; and the reason for which Merrill Lynch calculated a Price/Book Value with mean and median multiples of 1.7x and 1.6x—numbers greater than the high and low multiples of 1.5x and 1.4x.

(c)     With respect to the *Discounted Cash Flow Analysis*: management's projections utilizes in the analysis; the definition of levered, after-tax free cash flow utilized in the analysis; the range of implied perpetuity growth rates used in the analysis; the method through which Merrill Lynch determined to apply exit multiples of 6.4x to 9.3x; the method

through which Merrill Lynch determined to apply discount rates ranging from 18.75% to 22.75%;

67.     This information which formed the basis of Merrill Lynch's various analyses is material to shareholders. Without an understanding of the underlying inputs and objective criteria used by Merrill Lynch in its analyses, shareholders have no understanding of what factors influenced the financial advisor's analyses, thereby rendering all statements pertaining to these analyses misleading.

68.     The Proxy also fails to disclose various material elements of the financial analyses performed by Deutsche Bank. These elements include:

(a)     With respect to the *Selected Companies Analysis*: the multiples observed for each company utilized in the analysis, and the reason for which Deutsche Bank decided against utilizing the calculated TEV/NBVRA multiples for each of the selected companies to calculate an implied value range for SeaCube stock;

(b)     With respect to the *Selected Precedent Transactions Analysis*: the criteria used to select the precedent transactions utilized in the analysis; the consideration paid in each of the precedent transactions; the total assets and market capitalization of each company party to the precedent transactions utilized in the analysis; the multiples observed for each of the precedent transactions utilized in the analysis, and; the implied values for the Company after applying TEV/LTM Revenue multiples;

(c)     With respect to the *Discounted Cash Flow Analysis*: management's projections utilizes in the analysis; the definition of free cash flow utilized in the analysis; the reason for which a cost of equity discount rates was utilized along with unlevered free cash flows in the analysis; the estimated adjusted net income for 2016 utilized in the analysis, as well as the

source of that figure; the method through which Deutsche Bank determined to apply discount rates ranging from 17.0% to 19.0%; the range of terminal values applied in the analysis, and; the range of implied perpetuity growth rates used in the analysis;

69.     This information which formed the basis of Deutsche Bank various analyses is material to shareholders. Without an understanding of the underlying inputs and objective criteria used by Deutsche Bank in its analyses, shareholders have no understanding of what factors influenced the financial advisor's analyses, thereby rendering all statements pertaining to these analyses misleading.

70.     The Proxy fails to disclose the work that the Company's financial advisors, Merrill Lynch and Deutsche Bank have done for SeaCube and its affiliates in the past two years, as well as the amount of consideration these advisors have received for such work. As Merrill Lunch and Deutsche Bank were retained to render an opinion asserting the fairness of the Proposed Transaction offer price, any information, the content and context of these opinions is material to SeaCube shareholders. As such, any omissions regarding the presence of any potential conflicts held by these advisors render their respective financial analyses materially misleading.

71.     The Proxy also fails to disclose various material elements regarding the Company's consideration of strategic alternatives. These elements include:

(a)     The content of conversations had by the Board throughout the sales process regarding the Company's strategic direction and business plan, including information regarding the content of said business plan, and;

(b)     The challenges to the Company's ability to maintain revenue growth and profit margins in future periods discussed by the Board during the first two quarters of 2012;

72.     This information, which bears directly on the process undertaken by the Board in determining to pursue a sale of the Company is material to shareholders as they will be cashed out of the Company after closing of the merger. The omission of this information regarding the Company's standalone business plan and strategic direction renders the statement that the SeaCube Board considered "the Company's current and historical financial condition, results of operations, competitive position, strategic options and prospects, as well as the financial plan and prospects" of the Company and the risks and uncertainties with respect to "achieving the Company's growth plans" misleading.

73.     The Proxy also fails to disclose various material elements regarding the sales process. These elements include:

(a)     The criteria used in the selection of potential strategic and financial buyers contacted through the sales process;

(b)     Whether any potential buyer other than OTPP expressed an interest in retaining management;

(c)     The reason for which Bidder C "had not previously been contacted by the Company's financial advisors" as of September 21, 2012, as well as how discussions between Company C and the Company were initiated;

(d)     The reason for which the five additional strategic buyers discussed on November 5, 2012 were not contacted during the initial solicitation of financial and strategic buyers in September and October;

(e)     When the additional six potential buyers, contacted as of December 11, 2012, were contacted as well as the criteria used in their selection. (Although the Proxy states that 32 potential buyers were contacted as of December 11, 2012, the Proxy only makes mention

of the initial 22 parties contacted in late September/October and the additional five contacted on November 5, 2012—this leaves 6 parties unaccounted for.);

(f)     How many of the 11 potential acquirers that entered into confidentiality agreements with the Company were strategic buyers and how many were financial buyers;

(g)     The reasons given by all potential bidders for either dropping out of the sales process, or failing to remain active in the sales process by January 4, 2013;

(h)     The reason for which the Board selected Bidder B to enter into the final round of the sales process, and did not invite Bidder C. This is particularly material in light of the fact that Bidder C had offered consideration of $22.00 per share, while Bidder B only offered consideration in the range of $21.00-$22.00 per share;

(i)     Whether the Board considered the creation of a Special Committee to oversee management's negotiations with potential buyers at any point in the sales process—a decision that is particularly important in light of the fact that OTPP made its intention to retain management known early in the sales process;

74.     This information, which bears directly on the process undertaken by the Board and the fairness of the consideration offered to SeaCube shareholders is material.  The omission of this information regarding the sales process renders the statements that the offer price "represented the highest offer price that the Company received for the Common Shares after a broad competitive solicitation of interest as well as the Board's and financial advisors' belief that the agreed price was the highest price per share Buyer was willing to agree to and the highest any buyer would offer," as well as that " the Board sought offers to purchase from a broad group of 32 potential buyers, including financial and strategic buyers . . ." materially misleading.

75.     The Proxy fails to disclose material information concerning the interests of the Company's officers and directors in the Proposed Transaction. In particular, the Proxy fails to disclose:

(a)     The dates and content of discussions between OTTP and management regarding the continued employment of members of management;

(b)     Whether any discussions regarding management's continued employment occurred between members of management and any other potential buyer, and if so, the dates and content of any such discussions;

(c)     The reason for which the Board determined to allow management to continue to run the sales process even after OTTP made its intentions to retain members of management known.

76.     This information, which bears directly on the process undertaken by the Board and management's potential conflicts of interest is material. The omission of this information regarding the sales process and management's conflicts of interest renders the statement that the Board "sought offers to purchase from a broad group of 32 potential buyers, including financial and strategic buyers, 11 of whom entered into confidentiality agreements with the Company and received information related to the Company," misleading.

77.     Accordingly, Plaintiff seeks injunctive and other equitable relief to prevent the irreparable injury that Company shareholders will continue to suffer absent judicial intervention.

**LOSS CAUSATION**

78.     Defendants' material omissions in the Proxy have substantially contributed to the economic loss that Plaintiff has incurred in being asked to vote in favor of the Proposed Transaction.

79.     Plaintiff is being asked to vote in support of the Proposed Transaction pursuant to the Proxy.  As detailed above, the Proxy fails to provide Plaintiff with material information necessary for him to make an informed decision regarding whether or not to vote in favor of the Proposed Transaction, and has given him materially misleading information.

80.     It is pursuant to this Proxy that Plaintiff is being asked to determine whether he believes the consideration offered in the Proposed Transaction is fair and adequate.

81.     Given that Deutsche Bank, one of the Company's financial advisors, set a target price for the Company's stock of $24.00 per share in November 2012, and that the financial analyses conducted by Deutsche Bank indicated a per share value of the Company as high as $28.50 per share, the consideration offered in the Proposed Transaction is inadequate.

82.     Thus, this Proxy soliciting SeaCube's shareholders support and containing material omissions demonstrates that the Board has accepted an insufficient price for the Company and is recommending that Plaintiff does the same while failing to provide him with all information necessary to make a decision regarding whether or not to vote in favor of the Proposed Transaction.

## CLAIMS FOR RELIEF

### COUNT I
### Violations of Section 14(a) of the Exchange Act
### and Rule 14a-9 Promulgated Thereunder

83.     Plaintiff repeats all previous allegations as if set forth in full herein.

84.     Defendants have issued the Proxy with the intention of soliciting shareholder support of the Proposed Transaction.

85.     Rule 14a-9, promulgated by SEC pursuant to Section 14(a) of the Exchange Act provides that a proxy statement shall not contain "any statement which, at the time and in the

light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.

86.    Specifically, the Proxy violates the Section 14(a) and Rule 14a-9 because it omits material facts, including those set forth above. Moreover, in the exercise of reasonable care, Defendants should have known that the Proxy is materially misleading and omits material facts that are necessary to render them non-misleading.

87.    The misrepresentations and omissions in the Proxy are material to Plaintiff, as well as the Company's other public shareholders, and Plaintiff and other shareholders will be deprived of their entitlement to cast a fully informed vote if such misrepresentations and omissions are not corrected prior to the vote on the Proposed Transaction.

**COUNT II**
**Violations of Section 20(a) of the Exchange Act**
**Against Individual Defendants**

88.    Plaintiff incorporates by reference each and every preceding paragraph as though fully set forth herein.

89.    SeaCube is liable as a primary violator of Section 14(a) of the Exchange Act and Rule 14a-9 as set forth herein.

90.    The Individual Defendants acted as controlling persons of SeaCube within the meaning of Section 20(a) of the Exchange Act. Because of their positions, the Individual Defendants had the power and authority to cause SeaCube to engage in the wrongful conduct complained of herein. By reason of such conduct, Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

**COUNT III**
**Claim for Oppression Under the Bermuda Companies Act of 1981**
**Against Individual Defendants**

91.     Plaintiff incorporates by reference each and every preceding paragraph as though fully set forth herein.

92.     In accordance with Section 111 of the Bermuda Companies Act of 1981, any shareholder who alleges that the affairs of the company are being conducted or that the powers of the directors of a company are being exercised, in a manner oppressive to him or other shareholders, or in disregard of his or their interests, may apply to the court for an order.

93.     If, after such application, the court concludes that the company's affairs are being conducted, or the directors 'powers are being exercised in accordance with these allegations, the court may bring such matters to an end with "such order as it thinks fit." The court may bring such matters to an end by enjoining or rescinding the oppressive transaction.

94.     Directors' disregard for the interests of minority shareholders amounts to oppression under Bermuda law calling for a remedy. This is the case even where such disregard stems from a transaction put forward or entered into in good faith.

95.     Oppressive actions such as the Board's attempt to sell the Company at less than fair value, through a conflict of interest and in breach of its duties, provide the courts with the authority to enjoin such a sale under Bermuda law.

96.     As alleged above, the Individual Defendants have engaged in such oppressive actions. As the Individual Defendants control the business affairs of the Company and are privy to corporate information concerning the Company's assets, business and future prospects, there exists an imbalance and disparity of knowledge and power between them and the public stockholders of the Company. This imbalance makes it inherently unfair and oppressive for the

Individual Defendants to pursue any transaction through which they will receive disproportionate benefits to the exclusion of maximizing shareholder value.

97.     As a result of the Individual Defendants' oppressive actions, Plaintiff and the Class will suffer irreparable injury in that they have not and will not receive their fair portion of the value of SeaCube's assets and will be prevented from benefiting from a value-maximizing transaction.

98.      Unless enjoined by this Court, the Individual Defendants will continue these oppressive actions towards the Plaintiff and the Class, and may consummate the Proposed Transaction, to the irreparable harm of the Class.

**WHEREFORE**, Plaintiff demands judgment against defendants jointly and severally, as follows:

(A)     declaring this action to be a class action and certifying Plaintiff as the Class representatives and his counsel as Class counsel;

(B)     declaring that the Proxy is materially misleading and contains omissions of material fact in violation of Section 14(a) of the Exchange and Rule 14a-9 promulgated thereunder;

(C)     Declaring that the Individual Defendants have acted and are acting in an oppressive manner to the Company's shareholders;

(D)     enjoining, preliminarily and permanently, the Proposed Transaction;

(E)     in the event that the transaction is consummated prior to the entry of this Court's final judgment, rescinding it or awarding Plaintiff and the Class rescissory damages;

        (F)     directing that Defendants account to Plaintiff and the other members of the Class for all damages caused by them and account for all profits and any special benefits obtained as a result of their conduct;

        (G)     awarding Plaintiff the costs of this action, including a reasonable allowance for the fees and expenses of Plaintiff's attorneys and experts; and

        (H)     granting Plaintiff and the other members of the Class such further relief as the Court deems just and proper.


Dated: February 20, 2013          Respectfully submitted,


          s/    Donald J. Enright
          LEVI & KORSINSKY, LLP
          1101 30th Street, NW
          Suite 115
          Washington, DC 20007
          (202) 524-4290

          *Attorneys for Plaintiff*